THEODORE B. STOLMAN (State Bar No. 52099),
MARINA FINEMAN (State Bar No. 193065),
CHRISTINE M. PAJAK (State Bar No. 217173), and
H. ALEXANDER FISCH (State Bar No. 223211), Members of
STUTMAN, TREISTER & GLATT PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile:  (310) 228-5788
E-mails:    tstolman@stutman.com
            mfineman@stutman.com
            cpajak@stutman.com
            afisch@stutman.com

[Proposed] Reorganization Counsel for Debtors and
Debtors in Possession

Debtors' Mailing Address:
100 North Barranca Avenue, Suite 900
West Covina, California 91791

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES**

| | |
|---|---|
| In re: | Case No.: 2:11-bk-25500-RN |
| HASSEN REAL ESTATE PARTNERSHIP, a California limited partnership, | Chapter 11 |
| EASTLAND TOWER PARTNERSHIP, a California limited partnership, | (Jointly Administered) |
| Debtors. | **DECLARATION OF TAREK ALHASSEN IN SUPPORT OF FIRST DAY MOTIONS** |
| Tax I.D. Nos. 95-3970215 and 95-3970217 | [To Be Set By Court] |

549863v.1

I, Tarek Alhassen, hereby declare as follows:

**Introduction**

1. I am over 18 years of age and, if called as a witness, I could and would testify to the matters set forth herein based upon my personal knowledge.

2. I am the Secretary of Hassen Real Estate Corporation ("**HREC**"), which is the general partner of Hassen Real Estate Partnership ("**HREP**"), one of the two debtors and debtors in possession in the above-captioned cases. I am also the Secretary of Hassen Eastland Corporation ("**HEC**"), which is the general partner of Eastland Tower Partnership ("**ETP**," and together with HREP, the "**Debtors**"), the other debtor and debtor in possession in the above-captioned cases. I have been the Secretary of HREC and HEC since November 2006.

3. The Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") on April 10, 2011 (the "**Petition Date**").

4. As Secretary of HREC and HEC, I am part of the senior management team of the Debtors that is in charge of strategic and financial planning, financing, business operations, and vendor relationships. I am involved with all major decisions made by the Debtors. Accordingly, I have personal knowledge of all major aspects of the Debtors' ongoing business affairs, day-to-day operations, financial condition, and books and records.

5. Based upon my personal knowledge of the Debtors, their business operations, and their books and records, I am qualified to give this Declaration on behalf of the Debtors.

6. I submit this Declaration in support of the first day motions (the "**First Day Motions**") that are concurrently being submitted to the Court. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, reports prepared for me by other officers of the partners of the Debtors, discussions I have had with other officers of the partners of the Debtors, or my opinion based upon my experience, expertise, and knowledge of the Debtors' operations, financial condition, and industry. If I was called upon to testify, I could and would testify competently as to my knowledge regarding the veracity of the facts set forth herein.

## Background

7.  HREP and ETP are "sister" California limited liability partnerships with a common limited partner, related general partners, a common guarantor, and a number of common creditors.

8.  HREP and ETP each are engaged in the business of commercial real estate development and operation in West Covina, California. HREP owns and operates a retail/office center known as the West Covina Village Shopping Center (the "**Shopping Center**"), while ETP owns and operates an office tower known as the Wells Fargo Bank Tower (the "**Tower**"). In this Declaration, I refer to each of these properties, which the Debtors have owned and operated since they were first built, as the "Property."

9.  The Property has been managed by an affiliate of the Debtors, Hassen Development Corporation ("**HDC**") (as successor to Hassen Development Company), for approximately twenty-eight years. HDC manages the development and leasing of the Property. Prior to the Petition Date, HDC was compensated for those services by receiving a management fee equal to (i) the sum of 3.5% of the gross minimum rent and the percentage rent derived from the Tower, and the amount received as administrative fees by ETP under the leases with respect to the Tower, and (ii) the sum of 4% of the gross monthly fixed minimum rent and the percentage rent derived from the Shopping Center, and the amount received as administrative fees by HREP under the leases with respect to the Shopping Center. HDC has agreed to accept a reduced amount, equivalent to what is necessary to continue providing management services, as a fee during the pendency of these cases.

10.  Since the construction of the Property twenty-eight years ago, HDC has been providing the Debtors with architectural, design, maintenance, preventative maintenance, janitorial, security, and construction services. Those services are performed by employees of HDC, which allocates to each specific project an appropriate charge based on the actual amount of hours worked and expenses incurred for each such project.

11.  The fact that the Debtors conduct much business with HDC, an affiliate, is not at all unusual for real estate partnerships. This type of arrangement permits the Debtors to minimize

overhead costs and maximize economies of scale.  This, in turn, allows the Debtors to provide the highest quality tenant services at extremely competitive rates.  For example, by performing much of their design and construction work "in-house" at HDC, the Debtors are able to take advantage of HDC personnel's accumulated knowledge and experience with the Property.  This allows HDC to provide and the Debtors to receive such services at a cost lower than would be charged to the Debtors by third parties, and allowing the Debtors to be competitive in leasing.  The Debtors reimburse HDC for these actual costs, and the Debtors' continued reimbursement of these expenses, which include security and maintenance, is necessary to the continued operation of the Property.

12. HREP and ETP are each a borrower under one of two promissory notes (the "**HREP Note**" and the "**ETP Note**" respectively and together the "**Notes**"), both dated November 21, 2006 and each in the principal amount of $41 million.  The Notes and various documents directly related thereto, including two documents titled "Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing" (each a "**Deed of Trust**") between Column Financial, Inc. ("**Column**") and HREP and ETP, respectively, are collectively referred to as the "**Loan Documents**" herein.  The Debtors' obligations under the Notes are cross-collateralized, and the Loan Documents with respect to each contain cross-default provisions.  HREP's obligations under the HREP Note are secured by a first priority lien on the Shopping Center and ETP's obligations under the ETP Note are secured by a first priority lien on the Tower.  Both Notes are further secured by substantially all of the Debtors' property, including the Property, cash, leases and rents (the "**Collateral**").

13. The lender under both Notes, Column Financial, Inc., sold the loans to Credit Suisse First Boston Mortgage Securities Corp. ("**Credit Suisse**").  Based upon information and belief, Credit Suisse then "securitized" both loans and a pool of loans to other borrowers via the Credit Suisse Commercial Mortgage Trust 2006-C5 (the "**Securitization Trust**").  The representatives of the Securitization Trust are KeyCorp Real Estate Capital Markets, Inc. d/b/a KeyBank Real Estate Capital ("**KeyCorp**") as "Master Servicer," LNR Partners, Inc. ("**LNR**") as "Special Servicer," and Wells Fargo Bank, N.A. ("**Wells**") as trustee.

14. Based upon information and belief, the HREP Note and ETP Note are now held by CSMC 2006-C5 Azusa Avenue Limited Partnership (the "**Azusa Partnership**") and CSMC

2006-C5 Barranca Street Limited Partnership (the "**Barranca Partnership**" and, together with Azusa Partnership, the "**Lenders**"), respectively, and LNR acts as the "Special Asset Manager" for both these Partnerships. As of the Petition Date, Azusa Partnership contends that HREP owes approximately $48.6 million on account of the HREP Note, and Barranca Partnership contends that ETP owes approximately $50.5 million on account of the ETP Note.

15. The Loan Documents established various reserve accounts ("**Reserve Accounts**"), which were funded by the Debtors. Most significantly, the ETP Deed of Trust established a $4,250,000 reserve that was funded by ETP on or about November 21, 2006 (the "**Earnout Reserve**"). ETP contends that the Securitization Trust and its representatives wrongfully refused to release $3.5 million of the funds in the Earnout Reserve, in face of ETP's satisfaction of all conditions precedent to such release. The total amount of all of the Debtors' funds currently held in the Reserve Accounts is almost $5.1 million, consisting of $4,564,668.32 of ETP funds and $531,271.40 of HREP funds.

16. Prior to the Petition Date, ETP satisfied all conditions to the release of $3.5 million of the Earnout Reserve, and KeyCorp approved release of such funds to ETP; however, KeyCorp's approval was subsequently overturned by LNR. During the same period, the poor condition of the general economy began to affect the Debtors as certain tenants became delinquent on their rent. Additionally, ETP was compelled by LNR to make significant deposits into a tax impound account during the period December 2008 through April 2009. As a result, ETP was unable to make its April 2009 payment on the ETP Note, and ETP's default automatically triggered the default of HREP's Note.

17. The Debtors, subsequently, entered into a series of forbearance agreements with the Lenders and, in connection therewith, entered into a further agreement that required all cash flow from the Property (i.e., monthly tenant payments from the Shopping Center and Tower) to be deposited directly into an Excess Cash Flow Account established at KeyBank, which is, upon information and belief, affiliated with the Master Servicer, KeyCorp. Each month, the Lenders would disburse sufficient funds to the Debtors to pay the operating and maintenance expenses of the Property, pursuant to an agreed upon budget.

18.     As of the Petition Date, the Debtors are operating on a cash flow positive basis, but the positive margin is insufficient to cure the delinquencies under the Loan Documents. During the forbearance period, the Lenders and Debtors discussed refinancing the Notes. After months of negotiations with representatives of the Lenders, the Debtors have not been able to reach a consensual loan modification. As a result of this impasse, the Lenders informed the Debtors that they would not postpone the foreclosure sale of the Property that was scheduled for April 11, 2011. The Debtors were therefore left with no choice but to file these chapter 11 cases to reorganize and preserve the Debtors' operating business to maximize value for the Debtors' creditors.

### **First Day Motions**

19.     In connection with the preparation for these bankruptcy proceedings, I have reviewed the proposed First Day Motions that were filed concurrently with this Declaration. As set forth more fully below, I believe that that entry of orders granting the relief requested in the First Day Motions is critical to the Debtors' ability to continue to operation, and thus maximize the return to their estates and creditors.

A.     ***Ex Parte* Motion For Order Authorizing Joint Administration**

20.     I believe that it would be wasteful to administer the estates of the Debtors separately. The burdens on the Debtors, and I believe the Court and creditors, would be increased materially if these cases were not jointly administered. Specifically, I believe the following reasons support joint administration:

    a.     The Debtors are closely related entities, sharing common management and ownership. HREP and ETP also share a common executive office at 100 North Barranca Avenue, Suite 900, West Covina, California;

    b.     There is a substantial overlap in the Debtors' creditors. HREP and ETP are the obligors under the two Notes that are not only cross-defaulted and cross-collateralized, but also guaranteed by one of the common owners of HREP and ETP. Jointly administering the estates will eliminate the unnecessary and expensive duplication of effort and paper that would be caused by requiring the Debtors to prepare and serve the same creditors with duplicative sets of differently captioned, but substantively identical papers; and

c. Because of the close relationship between the Debtors' businesses and the operation of their businesses, some creditors may be uncertain as to which Debtor is their obligor. Joint administration of the estates would provide each creditor with notice of all matters relating to both of the Debtors, thereby insuring that creditors are fully informed of all matters potentially affecting their claims.

21. I believe that joint administration will greatly reduce the cost of administering the Debtors' cases and would eliminate the substantial waste, unnecessary paperwork, duplication, and confusion that would otherwise be created by maintaining separate pleadings dockets for these related cases. Most motions and other pleadings filed in these cases will concern both of the Debtors. If such motions (and the related responses and other pleadings) were required to be filed separately in each affected Debtor's case, it is likely that the only material difference among each set of pleadings would be the caption. Thus, requiring each Debtor to file separate pleadings in each matter would entail considerable duplication and additional paperwork at substantial cost, without generating any additional benefit to creditors.

22. I believe that joint administration of the Debtors' cases will also benefit creditors, because creditors who respond to motions affecting most or all of the Debtors, or who file their own motions affecting most or all of the Debtors, will not be forced to prepare and file multiple sets of papers that may be identical except for the captions.

23. The relief requested in the motion is not intended nor should be construed as seeking substantive consolidation, and the Debtors intend for each Debtor to have a separate claims register unless the Court orders otherwise.

**B.    Emergency Motion For An Order Extending Time To File Schedules And Statements**

24. I believe that it will take a substantial amount of time for the Debtors to analyze and compile the information needed to complete their Schedules and Statements.[1] Consequently, I believe that it is almost a certainty that the Debtors will not be able to prepare and file the Schedules and Statements within fourteen days of the Petition Date. Specifically, I believe

---

[1] Capitalized terms not otherwise defined here are defined in the relevant First Day Motion.

1 that the analysis and compilation of the information for the Schedules and Statements will take
2 significant time for the following reasons:
3      a.    There are urgent other demands upon the Debtors as a result of the
4 filing of these cases that will consume the time of the Debtors' small staff;
5      b.    The Debtors' operations involve numerous contracts, leases, and other
6 agreements, including tenant leases;
7      c.    Certain of the Debtor's liabilities may constitute contingent,
8 unliquidated claims relating to obligations that are difficult to quantify;
9      d.    The Debtors and their professionals need time to evaluate the
10 information comprising the Schedules and Statements once compiled; and
11      e.    The Debtors do not have a large corporate staff available to perform
12 and/or oversee all work necessary to prepare the Schedules and Statements.
13      25.    While the Debtors have commenced the process of assembling the
14 requisite information to prepare their Schedules and Statements, I believe that the fourteen-day
15 automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule
16 1007(c) will not be sufficient to permit completion of the Schedules and Statements.
17      26.    At this juncture, I believe that an extension of thirty (30) additional days
18 will provide sufficient time for the Debtors to prepare and file their respective Schedules and
19 Statements.
20      I declare under penalty of perjury under the laws of the United States of America that
21 the foregoing is true and correct.
22      Executed on April 10, 2011, at Abu Dhabi, United Arab Emirates.

*/s/ Tarek Alhassen*
Tarek Alhassen

549863v.1

8